**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: Matthew T. Minarik, | : | Chapter 7 |
| | : | |
| Debtor. | : | Bky. No. 25-10193 (PMM) |
| | : | |
| | : | |

# O P I N I O N

## I.  INTRODUCTION

Matthew T. Minarik (the "Debtor" or "Mr. Minarik") filed for chapter 7 bankruptcy protection, seeking, as most debtors do, discharge of unsecured debt as well as a reprieve from the stress that comes with not paying bills as they come due.  Mr. Minarik did not immediately receive such relief, even though the automatic stay, 11 U.S.C. §362, promises a cessation of collection activities once a debtor files a bankruptcy petition.  Instead, creditor PPL Electric Utilities Corporation ("PPL") continued its debt collection efforts and its related threats to discontinue the Debtor's electricity service.  To put an end to PPL's communications, the Debtor filed a Motion for Sanctions (doc. #19, the "Motion"), seeking compensatory and punitive damages.  PPL objects to this relief.

The facts are not in dispute.  However, the procedural posture of this matter—a debtor asking an Article I Bankruptcy Court to impose a monetary penalty—raises a thorny legal issue, one which the Court invited the parties to brief after the May 13, 2025, hearing: In light of the Supreme Court's recent Opinion in <u>Securities & Exchange Commission v. Jarkesy</u>, 603 U.S. 109, 122 (2024), may an Article I court impose punitive damages?  Or, under these

1

circumstances, does the Seventh Amendment guarantee a jury trial before an Article III[1]

tribunal?

Upon review of the relevant law and for reasons discussed below, the Court determines

that the public rights exception to the Seventh Amendment guaranty of a jury trial applies and

permits a Bankruptcy Court to impose punitive damages for a violation of the automatic stay.

While the Debtor is entitled to compensation for the emotional distress he suffered, there is no

evidence that the stay violation in this case was egregious or ongoing.  Punitive damages,

therefore, are not warranted.

## II.  FINDINGS OF FACT

### Background

1. This chapter 7 bankruptcy was filed on January 16, 2025.

2. An evidentiary hearing concerning the Motion was held and concluded on May 13, 2025.

3. The Debtor and Beth Annette Fronheiser (Credit and Collection Manager at PPL) testified at

   the hearing.

4. The Debtor is employed as a production manager for a radio station.

5. The Debtor is a disabled veteran; he suffers from anxiety, stress, nerve pain, and back issues.

   Transcript of May 13, 2025, hearing (doc. #29, "Tr.") at 7.

6. The Debtor and his wife have two (2) children and one (1) grandchild, all of whom are

   dependents.  The Debtor and his spouse also help support Mrs. Minarik's mother.  Tr. at 8.

7. Schedule E/F shows that the Debtor owes a balance of $996.00 to PPL.

8. PPL was listed as a creditor on the Matrix and received electronic notice of the bankruptcy.

   Tr. at 3, 16; doc. #2.

---

[1]    Article III of the Constitution vests "[t]he judicial Power of the United States ... in one supreme Court, and
in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. 3, § 1.

9.  At times, the Debtor's mother helped pay the Minariks' electric bill.  Tr. at 8.

**<u>Demands by PPL</u>**

10. Due to his unpaid electric bill, on February 27, 2025, the Debtor received a termination
    notice from PPL, stating that the Debtor's electricity would be turned off at 8:00 a.m. on
    April 3, 2025.  Tr. at 14; Exhibit D-1 (the "Termination Notice");

11. The Termination Notice stated that the Debtor was past due in the amount of $9,095.18 and
    further noted that payment arrangements are available.

12. In March 2025, the Debtor received another termination notice from PPL.  Tr. at 14; Ex. 1.

13. On March 25, 2025, Debtor's counsel filed a Motion for Sanctions and served the Motion by
    fax and mail.  Tr. at 4, 11.

14. On April 3, 2025, the Debtor received a shutoff notification by email, stating that his power
    would be turned off on April 16, 2025.  Tr. at 15; Exhibit D-2.

15. Around this time (beginning of April 2025), the Debtor received a text message from PPL
    indicating that his account was past due, and that service was scheduled to be shut off on
    April 16, 2025.  Tr. at 16-17; Exhibit D-4.

16.  The Debtor testified that PPL threatened to turn off the electricity "all the time."  Tr. at 8.

17.  Even after the bankruptcy was filed, the Debtor received "constant" phone calls and
    automated messages from PPL.  Tr. at 9-10.

18.  PPL intended for these communications to reach the Debtor.  Tr. at 28.

19.  The Debtor struggled to contact PPL to discuss the bills because of long wait times to speak
    with a representative.  Tr. at 10.

**The Debtor's Stress and Anxiety**

20. Filing for bankruptcy protection was difficult for the Debtor because he "felt like [he] was failing [his] family." Tr. at 9.

21. The Debtor's electric bill was his "biggest [financial] burden." Tr. at 8. Mr. Minarik was, in fact, "beyond stressed" when he contemplated an electricity shut off. Tr. at 8, 11.

22. Because the Debtor's daughter has chronic lung disease, the risk of electricity outages caused him to fear for her well-being. The family needs electricity to regulate their home's temperature for their daughter, and, if necessary, to provide her with oxygen. Tr. at 9.

23. After the petition was filed, the Debtor's creditors ceased contacting him, except for PPL, which continued. Tr. at 9, 12.

24. The persistent contact by PPL caused Mr. Minarik to think he had to pay his electric bill despite the bankruptcy filing; at times, he laid awake thinking about the debt. Tr. at 10.

25. The electricity in the Debtor's home was never shut off. Tr. at 8, 12, 27. However, Mr. Minarik continues to feel stress about the possible loss of electricity. Tr. at 12.

**Procedures at PPL**

26. Ms. Fronheiser described the procedures at PPL for handling bankruptcy matters.

27. She stated that prior to the instant case, the company did not have problems with regard to contacting debtors. Tr. at 21, 26.

28. After learning of the Electronic Bankruptcy Notices, Ms. Fronheiser changed the company's alert system and internal structure; employees were trained. Tr. at 21-23.

29. The post-petition communications with the Debtor resulted from internal problems and "human error." Tr. at 22-23, 26.

30. The Sanctions Motion was not properly flagged by PPL employees. Tr. at 22.

31. When PPL attempted to collect the debt owed to it by Mr. Minarik, the company did not intend to violate the automatic stay.  Tr. at 24.

32. By sending the Debtor notifications, PPL sought to motivate him to apply for "LIHEAP" (energy assistance) funds and/or to set up a payment agreement; PPL did not plan to actually shut off the Debtor's electric service.  Tr. at 24-25.

33. When the Debtor's account was removed from collections, he was promptly notified by phone call and letter that "no further collection activity will occur on your pre-petition debt." Tr. at 27; Ex. Def. 1.

### III. LEGAL STANDARDS

### A.  11 U.S.C. §362(k)

The automatic stay imposed by the Code is well known as a central tenet of bankruptcy protection.  See In re U Lock, Inc., 663 B.R. 30, 45 (Bankr. W.D. Pa. 2024).  Once a petition is filed, the stay prevents creditors from collecting certain debts or repossessing property.  And the Code gives this provision teeth.  Indeed, an individual injured by a willful violation of the stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. §362(k)(1).  Section 362(k) thus encourages an orderly and efficient distribution of assets by ceasing creditors' collection efforts and or harassment of the debtor.  Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999).

Section 362(k) remedies a "willful" stay violation.  Such a violation occurs when a "defendant knew of the automatic stay and [the defendant's] actions which violated the stay were intentional"; indeed, "specific intent to violate the automatic stay" is not required.  In re Toppin, 645 B.R. 773, 780 (E.D. Pa. 2022) (alteration in original) (quoting  In re Atl. Bus. & Cmty.

Corp., 901 F.2d 325, 329 (3d Cir. 1990)).  In other words, a willful violation occurs when a

creditor knows of the bankruptcy filing[2] and intentionally acts in a way that violates the stay.  A

creditor's good faith, or lack thereof, is not determinative of willfulness.  In re Lansaw, 853 F.3d

657, 664 n.4 (3d Cir. 2017); In re Lansdale Family Rests., Inc., 977 F.2d 826, 829 (3d Cir. 1992).


### B.  Relevant Supreme Court Precedent

As discussed below, section 362(k) allows courts to impose punitive damages under

limited circumstances   Seeking such relief, the Debtor alleges that PPL's conduct was

outrageous.  But before awarding this remedy, the Court must first determine whether the relief

sought is possible.  In light of the facts of this case and recent Supreme Court rulings, the

preliminary and potentially dispositive legal question here is whether a Bankruptcy Court—an

Article I tribunal—may impose punitive damages for a creditor's willful violation of the

automatic stay.  In other words, does the Seventh Amendment right to a jury trial extend to a

cause of action for a willful violation of the automatic stay?

To answer this question, the Court turns to a review of relevant Supreme Court precedent.

*Jarkesy*

Jarkesy is both the most recent decision on point and the precedent this Court invited the

parties to review.  Jarkesy, 603 U.S. at 122.  In Jarkesy, the Supreme Court held that the

Securities and Exchange Commission (the "SEC" or "Commission") violated the Seventh

Amendment by adjudicating monetary civil penalties for securities fraud before its own

administrative law judges ("ALJs"), rather than in an Article III forum.  See id. at 115, 125, 127.

---

[2]     The automatic stay is effective immediately upon the filing of the petition; formal service of process is not
required. 3 Collier on Bankruptcy P 362.12 (16th 2025).

The Seventh Amendment guarantees that in "[s]uits at common law, . . . the right of trial by jury shall be preserved." Id. at 122 . Courts have construed the phrase "suits at common law" to reference claims tried in courts of law, in which jury trials were customary before the Seventh Amendment was enacted. This is distinguished from courts of equity or admiralty, where jury trials were not customary. See id. at 122-23; Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n, 430 U.S. 442, 449 (1977).

In making this determination, the Supreme Court conducted a two (2) part analysis. First, the Court held that because the SEC's antifraud provision "replicates common law fraud," civil actions prosecuted thereunder "must be heard by a jury." Id. at 120. The monetary damages[3] imposed by the SEC pursuant to its antifraud provision are designed to "punish and deter," consistent with the "prototypical common law remedy." Id. at 120, 123, 125. Second, the Supreme Court determined that the "public rights exception" to the Seventh Amendment did not apply in this context. Id. at 120. Private rights, which are in the nature of an action between two (2) parties at common law, must be adjudicated in an Article III court with recourse to a jury. Id. at 127-28. Public rights, on the other hand, may be adjudicated outside of the Article III context (including, for example, by an administrative agency or a bankruptcy court). Id. at 128. Because the SEC's antifraud provision borrows from and replicates precepts of common law fraud, the public rights exception does not apply to the adjudication of related disputes before the Commission's ALJs. Id. at 136.

### *Atlas*

On the other hand, Atlas carved out a critical exception to the Seventh Amendment by identifying matters that qualify as "public rights"—causes of action created by Congress through

---

[3]   The SEC imposed a $300,000.00 fine (among other penalties) against Jarkesy and his co-Defendant. Jarkesy, 603 U.S. at 119.

statute.  See Atlas, 430 U.S. at 450.  A unanimous Supreme Court case from nearly half a

century ago, Atlas remains binding precedent despite criticism of its structure and holding.  See

e.g., Jarkesy, 603 U.S. at 135-137; Axalta Coating Sys. LLC v. Fed. Aviation Admin., 144 F.4th

467, 475  (3d Cir. 2025).

Petitioners in Atlas were cited and fined for violations of the Occupational Safety and

Health Act ("OSHA"), a statute enacted by Congress in 1970.  See Atlas, 430 U.S. at 444-45,

447.  Hearings were held before an OSHA Commission ALJ.  Id. at 447-48.  Upon review, the

Fifth Circuit held that this process did not violate the petitioners' Seventh Amendment right to

trial by jury.  Id. at 448.

Agreeing with the Fifth Circuit, the Supreme Court held that "[a]t least in cases in which

'public rights' are being litigated[,] e.g., cases in which the Government sues in its sovereign

capacity to enforce public rights created by statutes within the power of Congress to enact[,] the

Seventh Amendment does not prohibit Congress from assigning the factfinding function and

initial adjudication to an administrative forum with which the jury would be incompatible." Id. at

450.  Hence, Congress may, as it did with OSHA, create a new statutory "public right"

delineating duties and privileges held by the community at large, rather than by individuals, and

assign the adjudication of those rights to something other than an Article III forum.  Id. at 455.

### *Granfinanciera*

Under Jarkesy, the principles of a case from more than 35 years ago—Granfinanciera,

S.A. v. Nordberg, 492 U.S. 33(1989) —remain dispositive.  See Jarkesy, 603 at 120, 132.  In

Granfinanciera, the Supreme Court held that the defendant in a fraudulent conveyance action

brought by the bankruptcy trustee has a Seventh Amendment right to a jury trial, despite the fact

that fraudulent transfer actions are deemed "core" bankruptcy proceedings by Congress.

8

Granfinanciera, 492 U.S. at 36.  According to Jarkesy, the fraudulent conveyance at issue in

Granfinanciera was a common law cause of action.  Jarkesy, 603 U.S. at 132-33.  Thus,

fraudulent conveyance amounts to a traditional legal claim, requiring a jury determination;

Congress's creation of an alternative forum for the adjudication of such a claim does not displace

that requirement.  Id. at 133.

In deciding whether the Seventh Amendment applied, the Supreme Court employed a

three (3) step analysis.  First, the Court inquired whether the statute at issue mirrored a common

law cause of action (as opposed to an equitable cause of action) reviewable in the courts of

England prior to the merger of law and equity.  Grandfinanciera, 492 U.S. at 42.  Second, the

Court examined the nature of the remedy sought to determine whether "it is legal or equitable in

nature."  Id. (quoting Tull v. United States, 481 U.S. 412, 417-18 (1987)).  Third, if the

preceding two factors suggest the claim is legal in nature, the Seventh Amendment is implicated,

and the Court must then decide if the "public rights exception" permits adjudication of the claim

in a non-Article III forum.  Id. at 42 &  n.4.

Reviewing these three (3) steps, the Granfinanciera Court concluded the defendant was

entitled to a jury trial.  First, the Court noted that fraudulent transfer actions existed at common

law; these suits are not equitable actions.  Id. at 43.  Second, the remedy sought—money

damages—suggests that the fraudulent transfer action was one at law rather than equity.  Id. at

47-48 ("[W]here an action is simply for the recovery . . . of a money judgment, the action is one

at law" (quoting Pernell v. Southall Realty, 416 U.S. 363, 370 (1974)).  Third, because

fraudulent conveyance actions arise out of but are not intricately connected with the structure and purpose of bankruptcy, they are private, rather than public, causes of action.  Id. at 56.[4]

### C.  Third Circuit Law

A review of recent, relevant Third Circuit case law also helps resolve this issue.

### 1.  *Axalta*

The Third Circuit recently followed Atlas and held that the Seventh Amendment does not prohibit the adjudication of public rights by an administrative agency.  Axalta, 144 F.4th at 477. In Axalta, the Federal Aviation Administration ("FAA") filed an administrative complaint, alleging that Axalta Coating Systems failed to package a can of paint as required by the Hazardous Materials Regulations ("HMR").  Id. at 471.  The paint spilled on a plane during shipping.  Id.  The FAA's complaint was heard by an ALJ, who assessed a civil penalty in the amount of $1,900.00.  Id.  The FAA administrator affirmed the penalty.  Id.  Axalta appealed to the Third Circuit.  Id.

Because the FAA conceded that the civil penalty imposed was a "prototypical common law remedy," and thus that the Seventh Amendment's jury guarantee was implicated, the Third Circuit focused on the second prong of the Jarkesy test: whether the public rights exception applies.  Axalta, 144 F.4th at 475 (quoting Jarkesy, 603 U.S. at 123).

The Axalta court concluded that the exception applied because the HMR was not grounded in "common law soil."  Id. at 476 (quoting Jarkesy, 603 U.S. at 137).  Instead, the

---

[4]        A case decided a couple of years prior to Granfinanciera, Tull v. United States, 481 U.S. 412 (1987) , also upheld a Seventh Amendment right.  Tull held that the Clean Water Act—legislation enacted by Congress—was akin to a "common law" cause of action and thus guaranteed a Seventh Amendment jury trial.  Id. at 427.

regulations at issue in Axalta, like the regulations in <u>Atlas</u>, were "technical prescriptions for engaging in the regulated activity." <u>Id.</u>

## 2. *Sun Valley Orchards*

Reaching the opposite conclusion, the Third Circuit recently held that an Article III jury trial was guaranteed to a defendant on whom the Department of Labor ("DOL") imposed substantial civil penalties for beach of an immigration employment agreement. <u>Sun Valley Orchards, LLC v. U.S. Dep't of Lab.</u>, 148 F.4th 121, 124 (3d Cir. 2025) .

Sun Valley, a farm in New Jersey, relied on foreign seasonal labor, which was permitted pursuant to certain DOL guidelines. <u>Id.</u> at 124-25. Upon investigating the terms and conditions of the foreign laborers' employment, the DOL alleged violations of the laborers' contracts. <u>Id.</u> at 125. Accordingly, DOL assessed $212,250.00 in civil penalties and $369,703.22 in back wages against Sun Valley, payable directly to the DOL. <u>Id.</u> at 126. Sun Valley petitioned for review of this decision by an ALJ, the DOL's Administrative Review Board, and finally the district court. <u>Id.</u> at 126. In the district court, Sun Valley unsuccessfully argued that the DOL had adjudicated private rights in violation of Article III.

The Third Circuit reversed. Because the cause of action was contractual and the remedies sought—civil penalties and back wages—were common law remedies, the Third Circuit held that the matter concerned private rights; the public rights exception did not apply. <u>Id.</u> at 128-29. Although the DOL was correct that historically some immigration disputes turned on public rights, the Court found that the cause of action sounded in contract, rather than an immigration law. <u>Id.</u> The public rights exception "captures only matters that 'historically could have been determined exclusively by the executive and legislative branches.'" <u>Id.</u> at 130 (quoting <u>Jarkesy</u>, 603 U.S. at 128).

## IV.    THE PARTIES' ARGUMENTS

The Debtor insists that PPL's "systematic failure . . . to abide by the Automatic Stay"

warrants sanctions in the nature of punitive damages.  Tr. at 30.  Mr. Minarik argues that

slapping PPL with a large penalty is the only way to compel the conglomerate to comply with

the Code.  The violation of the stay was willful and pernicious, even if it was not motivated by a

harmful intent.  Further, the Debtor asserts that PPL is not entitled to a jury trial with regard to

the Debtor's request for punitive damages.  "Section 362(k) is a statutory cause of action

designed to enforce compliance with a core feature of the bankruptcy system, not to mirror

common-law remedies[.] . . . Because this claim arises from a broader regulatory scheme rather

than a common-law replica, no jury is required."  Doc. #30 at 3.

PPL notes that the Debtor failed to send a "cease and desist" notice; he simply filed a

Motion for Sanctions.  Tr. at 5.  PPL did not intentionally or systematically violate the automatic

stay.  Tr. at 6, 31-33.  The fact that the Debtor's electricity was never disconnected means that he

wasn't actually harmed.  Legally, PPL asserts that Seventh Amendment protection applies

because the relief sought is monetary rather than restorative relief and, therefore, legal in nature.

Because an alleged stay violation is similar to a common law tort, the public rights exception

does not apply.  Last, PPL argues that even if this Court has the power to award punitive

damages, such a punishment is not warranted in this case, as there has been no showing of harm

to the Debtor or egregious behavior.

## V.  DISCUSSION

### A.  The Possibility of Punitive Damages Survives <u>Jarkesy</u>

#### 1.  Seventh Amendment Protection Applies

In his motion, the Debtor seeks actual and punitive damages from PPL.  The company

ceased its collection efforts, and the Debtor's power remains on.  Thus, no injunctive relief is

sought.  Rather, the Debtor only seeks money damages.

As the case law discussed above makes clear, money damages are a common law civil

remedy and must be imposed by a jury, if at all, in accordance with the Seventh Amendment.

<u>See</u> <u>Jarkesy</u>, at 603 U.S. at 109, 120, 125, 134 ("In sum, the civil penalties . . .  are designed to

punish and deter, not to compensate.  They are therefore a type of remedy at common law that

could only be enforced in courts of law"); <u>Granfinanciera</u>, 492 U.S. at 48 (("[W]here an action is

simply for the recovery ... of a money judgment, the action is one at law." (quoting <u>Pernell v.

Southall Realty</u>, 416 U.S. 363, 370 (1974)).

Thus, the common law nature of punitive damages implicates the Seventh Amendment at the

first step of the <u>Jarkesy</u> analysis.  <u>Butler Amusements, Inc. v. U.S. Dep't of Labor</u>, 2025 WL

2457687, at *6 (D.D.C. Aug. 26, 2025).[5]

#### 2.  The Public Rights Exception Applies

But our inquiry does not end there.  <u>Jarkesy</u>'s second step requires a court to consider

whether the public rights exception to the Seventh Amendment applies.  <u>Butler Amusements</u>,

2025 WL 2457687, at *6.  Under this exception, Congress may "permissibly withdraw[]

jurisdiction" over suits not addressing private rights and assign adjudication of certain rights

---

[5]       The Debtor's argument that Bankruptcy Courts continue routinely to award punitive damages post-<u>Jarkesy</u>
is weakened by the fact that none of the cases cited discusses <u>Jarkesy</u>.  <u>See</u> Memorandum at 2, fn1.

"exclusively to non-Article III tribunals sitting without juries." <u>Granfinanciera</u>, 492 U.S. at 49;

<u>Atlas</u>, 430 U.S. at 450 (discussing certain statutory obligations—such as taxation and

immigration—and corresponding civil penalties Congress created and committed exclusively to

administrative adjudication).

With regard to the facts presented here, and upon close consideration of the origin and

purpose of the automatic stay, the Court finds that the public rights exception applies and

excuses the need for a jury trial to adjudicate the Motion.[6]

Critically, the Motion does not present a common law claim.[7]  In section 362(k),

Congress created a statutory cause of action and charged Article I Bankruptcy Courts with its

administration.  Originally, the automatic stay (enacted in 1978) "provided no mechanism for

enforcement . . . ." <u>In re Lansaw</u>, 853 F.3d 657, 665 (3d Cir. 2017).  Then, in 1984, Congress

enacted Section 362(k) to ensure compliance with the stay, <u>see</u> <u>id.</u> at 667, and to allow

Bankruptcy Courts to decide whether an infraction occurred.  <u>In re Schwartz–Tallard</u>, 803 F.3d

1095, 1100 (9th Cir. 2015) (reasoning a cause of action under 11 U.S.C. §362(k) exists to

vindicate the power of the automatic stay, a key part of the bankruptcy process); <u>In re Boltz-

Rubinstein</u>, 574 B.R. 542, 554 (Bankr. E.D. Pa. 2017) (stating that the power of the stay is

"vital" to the exercise of a bankruptcy court's powers); <u>In re Toppin</u>, 645 B.R. at 780 (same).

Congress has clear authority to implement such statutory causes of action and to assign

adjudications thereunder to a non-Article III forum.  Thus, the public rights exception enables

---

[6]     Given the Court's finding that PPL does not have a right to a jury trial, there is no need to discuss the
Debtor's argument that the right to trial has been waived by the creditor.  Memorandum at 10-11.  However, it is
worth noting that "because the right of jury trial is fundamental, courts indulge every reasonable presumption
against waiver."  <u>Tracinda Corp. v. DaimlerChrysler AG</u>, 502 F.3d 212, 222 (3d Cir. 2007).

[7]     "Suits at common law" refers to "cases tried prior to the adoption of the Seventh Amendment in courts of
law in which jury trial was customary as distinguished from courts of equity or admiralty in which jury trial was
not." <u>Atlas</u>, 430 U.S. at 442.

Congress to entrust Bankruptcy Courts with applying and enforcing the automatic stay, a foundational bankruptcy right.[8] See Granfinanciera, 492 U.S. at 52 ("In certain situations, of course, Congress may fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable."); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 48-49 (1937) (holding suit to enforce a labor law by the NLRB did not implicate the Seventh Amendment because the suit was a "statutory proceeding" that was "unknown to the common law"); Axalta, 144 F.4th at 473. Providing a Bankruptcy Court with a mechanism to enforce the automatic stay is not simply a matter of efficiency; it is an integral part of the statutory scheme to allow breathing room for debtors while keeping creditors at bay.

The statutory, rather than common law, nature of §362(k) means that the matter at hand more closely resembles the disputed remedy in Atlas rather than the remedy sought in Granfinanciera and, therefore, that the public rights exception to the Seventh Amendment applies. Cf. Axalta, 144 F.4th , at 477 (stating that the public rights exception applies if an action is more like that in Atlas than that in Granfinanciera). In holding that an Article III jury trial was guaranteed, the Granfinanciera Court emphasized that the fraudulent transfer action at issue constituted "no part of the proceedings in bankruptcy but concern[ed] controversies arising out of it." Granfinanciera, 492 U.S. at 56. According to the Court, fraudulent transfer actions are common law matters resembling statelaw contract claims, rather than a cause of action to

---

[8]     The automatic stay requirement, for example, keeps creditors from "dismember[ing]" the estate while the bankruptcy case proceeds. Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin, 599 U.S. 382, 390 (2023). The stay is "one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all foreclosure action. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." In re Wagner, 74 B.R. 898, 902 (Bankr. E.D. Pa. 1987).

determine distribution to creditors; such suits "therefore appear [more like] matters of private rather than public right." Id.

The remedy sought in Granfinanciera thus stands in stark contrast to the relief claimed here. Enforcement of the automatic stay, as opposed to the fraudulent transfer at issue in Granfinanciera, is not a legal issue that arises out of or in connection with the bankruptcy; rather, as discussed, the stay is a core bankruptcy protection that constitutes "a substantive right provided by the Bankruptcy Code." In re Roggio, 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020); see also In re LTL Mgmt., LLC, 645 B.R. 59, 68–69 (Bankr. D.N.J. 2022) (reasoning the automatic stay implicates core bankruptcy jurisdiction). The stay is not ancillary or adjacent to bankruptcy; the provision is central, insuring breathing room so that an orderly and efficient distribution—the purpose of the Code—can take place. Thus, removal of a jury determination concerning enforcement of the automatic stay is not merely a streamlined approach for the sake of efficiency (a concern of the Jarkesy Court).

Although Mr. Minarik seeks compensation for personal damage, his attempt to enforce the stay against improper collection efforts is not an interest unique to him, as would be true of a traditional contract, property, or tort action. Rather, institution and enforcement of the automatic stay is at bottom a protection of the public's interest in creating and maintaining a statutory system of orderly insolvency and reorganization. Because the automatic stay is fundamental to the congressionally enacted Bankruptcy Code, enforcement of §362(k) falls under the public rights exception.

## B. **Application to the Relief Sought in the Motion**

While the public rights exception allows an Article I Bankruptcy Court to award punitive damages, this does not necessarily mean that such damages—reserved for the most egregious

circumstances—are appropriate in this case.  As discussed below, although the Debtor is entitled to actual damages for emotional distress, punitive damages are not warranted.

### 1.  PPL Willfully Violated the Automatic Stay

The automatic stay halts all harassment of and collection from the debtor.  In re Univ. Med. Ctr., 973 F.2d 1065, 1074 (3d Cir. 1992).  Section 362(k)(1) provides, in relevant part, that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. §362(k)(1).

To satisfy section 362(k)(1), the Debtor must show by a preponderance of the evidence that (1) the creditor violated the automatic stay; (2) the violation of the stay was willful; and (3) the willful violation caused the debtor an injury.  In re Johnson, 601 B.R. 365, 377 (Bankr. E.D. Pa. 2019).

PPL does not dispute that it violated the automatic stay.  The company acknowledges that it had notice of the Debtor's bankruptcy filing and continued to text and call the Debtor post-petition.  Those communications included several notifications that the Debtor's electricity would be turned off if payment was not made.  PPL sought to collect a debt following the imposition of the automatic stay, a provision designed precisely to put an end to such prodding. PPL's only response is that the post-petition communications resulted from clerical and human error and that the company's systems have since been updated to correct such defects.  PPL's awareness of and attention to its flawed systems may serve to prevent future violations, but that possibility does not impact the conclusion here.  "Willfulness" requires not an intent to violate the stay but rather an intent to commit the act(s) which violate the stay.  In re Lansaw, 853 F.3d

at664 n.4.  "[A] creditor's 'good faith' belief that he is not violating the automatic stay provision

is not determinative of willfulness . . . ."  In re Lansdale Fam. Rests., Inc., 977 F.2d at 829.

The evidence shows that PPL, with notice of this proceeding, intended to convey its

threatening, post-petition communications to the Debtor.  Thus, PPL wilfully violated the stay.

## A. **Actual Damages**

Section 362(k)(1) allows the recovery of actual damages.  The Third Circuit has held that

non-pecuniary emotional harm constitutes "actual damages" within the meaning of section

362(k).  In re Lansaw, 853 F.3d at667.  A Plaintiff who seeks compensation for a stay violation

must prove actual damages with reasonable certainty and bears the burden of proving all aspects

of his actual damages claim.  In re Vu, 591 B.R. 596, 604 (2018); In re Johnson, 601 B.R. at

378-79.

Here, although the Debtor did not provide evidence that he incurred medical costs or that

he lost wages as a result of the Defendant's willful violation, Mr. Minarik credibly testified that

PPL's continued, threatening communications caused him emotional distress.  See Findings of

Fact 20-25; Motion at 4.  The Debtor's account of the facts and his reaction to PPL's

communications are sufficient grounds for the Court to find—and provide compensation for—

emotional distress; corroborating medical evidence is not required.  In re Lansaw, 853 F.3d at

669.  Understandably, the Debtor was distraught, anxious, and sleepless at the prospect that the

threatened termination of his family's electricity would endanger the health of his child, who has

chronic lung disease and occasionally relies on an oxygen tank.  This testimony provides "clear

evidence" of the Debtor's "emotional distress."  In re Laskaratos, 605 B.R. 282, 309 (Bankr.

E.D.N.Y. 2019); In re Lansaw, 853 F.3d at 670 (noting that the necessary evidence of harm will

"vary from case to case").

Using its discretion, the Court finds that the Debtor is entitled to $20,000.00 for the actual

harm of his emotional distress.  This award is 80% of what the Debtor seeks, see Amended

Motion Ex.7, and is reasonable in light of both the evidence presented and the awards in similar

cases.  See In re Almy, 669 B.R. 415, 428 (Bankr. D. Or. 2025); In re Johnson, 601 B.R. at381

n.33 (listing examples); In re Laskaratos, 605 B.R. at311 (courts may look to awards in other

cases to "serve as guideposts"); In re Odom, 570 B.R. 718, 724 (Bankr. E.D. Pa. 2017).[9]

### B.  Punitive Damages

Finally, we get to the factual question that precipitated the legal discussion above: is the

Debtor entitled to punitive damages for PPL's violation of the stay?  Although an Article I

Bankruptcy Court may award punitive damages for a stay violation after Jarkesy, the Court

concludes that the facts of this case do not merit such an award.

Section 362 specifies that a debtor may receive punitive damages "in appropriate

circumstances."  11 U.S.C. §362(k)(1).  A court should consider the following factors when

contemplating an award of punitive damages: "(1) the nature of the [Defendant's] conduct; (2)

the [Defendant's] ability to pay; (3) the [Defendant's] motives; and (4) any provocation by the

debtor."  In re Vu, 591 B.R. at607  (alteration in original); see also In re Boltz-Rubinstein, 596

B.R. at 503 n.9.  Punitive damages are appropriate only in cases in which the stay violations

were "reprehensible" and "egregious."  In re Lansaw, 853 F.3d at 669, 671 (noting the defendant

physically intimidated the debtors); see also Cochetti v. Desmond, 572 F.2d 102, 106 (3d Cir.

1978) (punitive damages are "reserved . . . for cases in which the defendant's conduct amounts to

---

[9]     The Debtor asks, by mere mention in an attachment to an exhibit, for reimbursement for attorney's fees and
costs. See Amended Motion, Ex. 7.  Attorney's fees incurred in prosecuting an action for a violation of the stay are
usually considered to be "actual damages." 3 Collier on Bankruptcy P 362.12 (16th 2025).  However, the Debtor
presented no evidence with regard to the fees incurred and has thus not met his burden with regard to this portion of
damages.  Separately, the Court is aware that by agreement Debtor's counsel will receive 40% of any amount
awarded in connection to the Amended Motion. Doc. #15.

something more than a bare violation justifying compensatory damages or injunctive relief"). Whether to assess punitive damages lies in the discretion of the Court. In re Laskaratos, 605 B.R. at 300.

PPL's actions, while inappropriate and outside the law, were not the kind of reprehensible behavior that calls for a monetary judgment meant to punish and deter. Rather, because PPL's automated pleas for repayment of debt were impersonal and routine - the kind of continued communication that one might expect from a large utility company - the actions were not egregious. This is not to excuse the actions of PPL or to minimize the Debtor's fear of receiving threats to discontinue his electricity. The point is that the evidence does not demonstrate that PPL acted in the kind of shocking or flagrant manner that warrants the rare award of punitive damages. See In re Vu, 591 B.R. at 608 (awarding punitive damages where the Defendant purposely prevented the Debtor from claiming his property and refused to answer communications); In re Johnson, 601 B.R. at 383 (awarding punitive damages where the Defendant's behavior was "deliberate, reprehensible, and unjustifiable."). The company's payment systems erroneously continued to route texts and phone calls to the Debtor; this is disruptive, to be sure, but not over-the-top action that shocks the conscience.

In fact, the Debtor offers no evidence that PPL targeted Mr. Minarik. Instead, the Debtor focuses on an issue not in dispute, namely that PPL is a big company with a lot of money that can easily afford to pay punitive damages:

> For the year ending December 31, 2024, the Creditor reported gross revenue of $8.46 billion and net income of $888 million. That explains why this Motion's original demand of $40,000 in damages did not stop the Creditor from continuing to violate the stay. To the Creditor, that amount is chump change.

> To deter future violations of the automatic stay, the Court must impose meaningful and substantial punitive damages commensurate with the Creditor's ability to pay.

Motion at 7.  The Debtor's contention that big pockets warrant a big penalty[10] might be persuasive if evidence of an ongoing pattern of abusive behavior by the company had been presented.  No such evidence was offered.  While the testimony of PPL's representative hinted that there may be systemic problems in the way that the company files, stores, and flags information about a customer's declaration of bankruptcy, the testimony was not sufficient for the Court to conclude PPL engaged in a persistent, abusive course of conduct.  And the Debtor offered no additional testimony or documents to show PPL's behavior in the marketplace caused or continues to cause ongoing or sweeping stay violations.  Nor can the Debtor make a credible argument that PPL should pay a large award simply because it is profitable.  Consequently, the Court cannot conclude that PPL must be smacked with a punitive award in order to punish past and deter future actions.

For these reasons, the Debtor will not prevail on his request for punitive damages.

## VI.    CONCLUSION

The undisputed facts show that PPL willfully violated the automatic stay by continuing to seek payment of its pre-petition debt from Mr. Minarik.  The repeated communications caused the Debtor to fear his electricity would be turned off due to his failure to pay.

Because the Debtor sought both actual and punitive damages to remedy PPL's stay violation, this straightforward set of facts led to a less than simple legal question: does the Bankruptcy Court maintain the ability to award a debtor punitive damages following the Supreme Court's ruling in Jarkesy, which held that certain administrative enforcement actions cannot be maintained absent recourse to a jury trial?

---

[10]    The Debtor increased his punitive damage demand from $40,000.00 to $125,000.00.  See Amended Motion.

For the reasons discussed above, damages for a violation of the automatic stay fall squarely within the public rights exception to the Seventh Amendment. Therefore, punitive damages remain on the table when a Bankruptcy Court considers how to remediate a stay violation.

However, such damages are not warranted here.  PPL's actions caused actual emotional harm to the Debtor, for which he will receive compensation in the amount of $20,000.00. Although the Debtor suffered, the violation was not egregious, intentional, or flagrant. Therefore, punitive damages are not appropriate.  An appropriate order will be entered.

**Date:**    November 17, 2025

_____

**PATRICIA M. MAYER**
**U.S. BANKRUPTCY JUDGE**